# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD CAMPOS, *et al.*,<br><br>           Plaintiffs,<br><br>  v.<br><br>MICHAEL FAILLA, *et al.*,<br><br>           Defendants. | Case No. 15-cv-790-BAS(JLB)<br><br>**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS**<br><br>**[ECF Nos. 15, 19, 21, 36]** |

On April 9, 2015, Plaintiffs Edward Campos, Brian Blatz, and Scott Noll commenced this action against Defendants Michael Failla, Robert Moberg, Integrated Practice Solutions, Inc., as a Washington and Delaware corporation, d/b/a ChiroTouch, Clean Conversion Technologies, Inc. ("CCT"), R. Michael Jones, and the law firm Higgs, Fletcher & Mack, LLP ("Higgs Fletcher"). This action arises from an alleged breach of an oral contract resulting from a prior business relationship between the parties. Defendants move to dismiss all claims, except one, in four separate motions. Plaintiffs oppose.

//

The Court finds these motions suitable for determination on the papers submitted and without oral argument. *See* Civ. L.R. 7.1(d)(1). For the following reasons, the Court **GRANTS WITH LEAVE TO AMEND** Defendants' motions to dismiss.

## I.  BACKGROUND

### A.  Clean Earth Solutions

In the early 2000s, Mr. Campos formed a company called World Waste Technologies "for the purpose of capitalizing on business opportunities in the municipal waste industry." (Compl. ¶ 18.) He obtained a limited license for the Pressurized Steam Classification technology. (*Id.* ¶¶ 16-18.) Around that time, Mr. Campos retained Higgs Fletcher, and specifically Mr. Jones, who was an attorney at the firm, to "provide him and the company with legal services on an ongoing basis." (*Id.* ¶ 18.)

In 2006, Mr. Campos formed a new company called Clean Earth Solutions ("CES"), which "was able to enlarge the municipal waste business that World Waste Technologies had been engaged in by obtaining a greatly expanded license for the Pressurized Steam Classification technology." (Compl. ¶ 19.) CES also obtained ownership of the "autoclave vessels" from World Waste Technologies, which was necessary in order to use the Pressurized Steam Classification method. (*Id.*) Mr. Jones and Higgs Fletcher continued to provide legal services to Mr. Campos and CES. (*Id.* ¶ 20.) Mr. Noll was also hired as a "consultant to provide engineering services" and Mr. Blatz was hired to "serve as CES' in-house counsel." (*Id.*)

Plaintiffs began attracting investors between 2006 and 2009, most of whom were "passive in their investments." (Compl. ¶ 21.) Mr. Failla, who contributed $200,000, was among those early investors. (*Id.* ¶ 22.) Steve Vande Vegte was another investor who contributed over $1 million in 2008. (*Id.* ¶ 23.)

//

In 2010, CES experienced "financial troubles," and as a result, sought further capital contributions from some of its initial investors. (Compl. ¶ 24.) Mr. Failla was the only who expressed interest in contributing, but "before making an additional investment he wanted to closely inspect the company's books and records." (*Id.*) After examining the records, Mr. Failla concluded that the company had "great technology" but was in need of "significant capitalization." (*Id.* ¶ 25.) Mr. Failla allegedly told Plaintiffs "he was willing to put more money into the company, both personally and through his company ChiroTouch, but that he would not do so until CES was 'cleaned up.'" (*Id.*) Plaintiffs were "motivated to work with him, as he was the only one who had demonstrated interest in providing further investment, and they believed that without additional funding[,] everyone's investment would be lost." (*Id.*)

### B. Planning Stages of Starting a New Company

Plaintiffs allege that after Mr. Failla examined CES' records, "he brought in his company, ChiroTouch, to assist in the transaction" and told Plaintiffs that "in making the investment, he wanted to filter many of the activities through ChiroTouch."[1] (Compl. ¶ 26.) They further allege that Mr. Failla brought in ChiroTouch's president, Mr. Moberg, "to assist in determining how they could move forward with CES' technology." (*Id.*)

"In early 2010," Messrs. Campos, Blatz, Noll, Failla, and Moberg met with attorney Mr. Jones to "brainstorm on how they could eliminate the strife among CES shareholders, so Failla would feel comfortable assisting the company with its fundraising efforts." (Compl. ¶ 27.) This meeting took place "in early 2010" at Higgs Fletcher's San Diego office. (*Id.*) At this meeting, Mr. Jones allegedly "devised a plan in which Campos, Blatz, Noll, Failla, Moberg and ChiroTouch would

---

[1] According to ChiroTouch, it is a "chiropractic software company that has nothing to do with waste management[.]" (ChiroTouch's Mot. 1:10-13.)

start a new company, and then transfer CES' main assets—the autoclave vessels and the license—to the new entity, which would then operate the business from that point forward." (*Id.*) Mr. Jones allegedly said that "he could structure the deal in a way that would be 'legal,' and in a way that would alleviate Failla's concerns so that he would feel comfortable making a further investment." (*Id.*) Upon hearing that Messrs. Jones, Failla, and Moberg agreed to "make sure the CES shareholders would be given shares in the new company," and because of Mr. Jones' representation that he could structure the deal to be legal, Plaintiffs agreed to the plan. (*Id.* ¶ 28.)

> Plaintiffs describe Mr. Jones' plan as follows:
>
> Jones told the group that because Campos, Blatz and Noll were actively involved in operating CES, it was important they not be shown as having any part of the new company, or the transfer of the assets to the new company. Jones explained that even though their plan was completely legal, CES shareholder Steve Vande Vegte (who had invested over $1 million in CES) was angry over the financial troubles CES was experiencing, and thus might try to challenge the transfer of assets away from CES. Jones therefore advised Campos, Blatz and Noll that to lessen the chance of being sued by a disgruntled investor, they needed to have no ownership of the new company "on paper" until the risk of Vande Vegte suing passed. Jones also told the group that Campos, Blatz and Noll could not have any roles as officers or directors on paper with the new company until he told them it was safe to do so. Thus, Jones instructed Campos, Blatz and Noll to not have shares of the new company issued to them, and to not enter into any officer employment agreements, until Vande Vegte was no longer an issue. Jones advised them it needed to appear as though Failla was running the company. Campos, Blatz and Noll followed Jones' advice, and Failla and Moberg, both individually and on behalf of ChiroTouch, agreed to actively participate in the plan.

(Compl. ¶ 29.) Everyone also allegedly orally agreed that Plaintiffs "would run the day-today operations of the company, serve as the company's officers and on the board of directors, and own the majority of the company." (*Id.* ¶ 30.) Additional

terms to the oral agreement allegedly included a detailed ownership structure assigning 54% of the shares in the new company to Plaintiffs, and that Plaintiffs "would also have paid, full time officer positions in the new company, as well as board seats[.]" (*Id.* ¶¶ 31-33.)

### C.  Clean Conversion Technologies

On June 2, 2010, Mr. Failla formed the new entity Clean Conversion Technologies, Inc., formally identifying himself as president, vice president, secretary, treasurer, and chairman of the board. (Compl. ¶ 36.) Upon forming CCT, Mr. Failla allegedly reaffirmed the agreement that CCT would: (1) issue 54% of its shares to Plaintiffs; (2) confer to Plaintiffs certain officer and director positions; and (3) issue shares of CCT to CES shareholders. (*Id.* ¶ 37.)

The next step in the plan was to "legally" transfer the autoclave vessels to CCT by purchasing them from the storage yard where they were held after CES defaulted on its storage bill. (Compl. ¶ 38.) This step was successfully executed when Mr. Failla and ChiroTouch allegedly purchased the vessels from the storage company for $48,625 despite their value being up to $1,514,162 on CES' balance sheet. (*Id.*) The intellectual-property license was obtained in a similar manner through a promissory note secured by the license owed to Higgs Fletcher. (*Id.* ¶ 39.) After CES expectedly defaulted on its payments, Higgs Fletcher foreclosed on the collateral in late 2010 with no one responding except Mr. Failla and ChiroTouch, who bought the license for $43,502 on December 15, 2010, despite being valued on CES' balance sheet at $940,000. (*Id.*)

As Mr. Jones predicted, shortly after the asset transfer from CES to CCT, CES shareholder Mr. Vande Vegte filed a lawsuit challenging the transfer. (Compl. ¶ 40.) Mr. Jones, once again, allegedly advised Plaintiffs that they should remain "off the books" of CCT until after the lawsuit was resolved. (*Id.*) To strengthen the appearance that Plaintiffs were "separate" from Mr. Failla and CCT in the Vande

Vegte lawsuit, Mr. Jones allegedly arranged for Plaintiffs to be represented by separate counsel, former Higgs Fletcher attorney Robert Hocker. (*Id.* ¶ 41.)

After CCT's formation, and presumably while defending the Vande Vegte lawsuit, Plaintiffs, Mr. Failla, Mr. Moberg and ChiroTouch "embarked on a mission to get CCT operational and to attract further investment." (Compl. ¶ 42.) That included holding shareholder and board meetings in ChiroTouch's San Diego offices, and representing Plaintiffs as owners and officers despite not being officially listed as such. (*Id.* ¶¶ 43-44.) "The company's first major undertaking was to enter into an agreement with Greenstar North America . . . to build a state-of-the-art waste processing plant in San Antonio, Texas[,]" a deal for which Plaintiffs were allegedly responsible. (*Id.* ¶ 45.) Plaintiffs along with Mr. Failla and Mr. Moberg also continued to solicit investment capital for CCT. (*Id.* ¶¶ 46-48.) And CCT also developed and launched a new product called the Oil Ranger, which was trademarked with the help of Higgs Fletcher. (*Id.* ¶ 49.)

Based on these efforts, Plaintiffs allege that CCT became "increasingly successful." (Compl. ¶ 50.) Plaintiffs attest to the accuracy of Mr. Failla's statement that "[i]n just seven months, our original investors have seen a 20% increase in the value of their shares, and we [CCT] remain 100% debt free." (*Id.* ¶¶ 50-51.) CCT's March 2013 balance sheet allegedly showed total assets of $10,771,659 and $246,065 in current liabilities. (*Id.* ¶ 51.) Plaintiffs contend that following Messrs. Failla and Moberg successfully securing $12 million of funding in exchange for 25% of the company, CCT was valued at $48 million. (*Id.*)

The Vande Vegte lawsuit eventually settled in late April 2013. (Compl. ¶ 52.) In August 2013, after the Vande Vegte lawsuit settlement became effective, Plaintiffs approached Messrs. Failla, Moberg, and Jones about having their CCT shares issued and their officer employment contracts finalized. (*Id.* ¶ 53.) In response, Plaintiffs allege that Messrs. "Failla and Moberg, both acting individually and on behalf of ChiroTouch, informed the Plaintiffs they were not willing to give them 54% of the

company—as everyone had [allegedly] agreed—but instead would give them a reduced share, and no employment agreements." (*Id.*)  Mr. Jones allegedly told Plaintiffs that Mr. Failla would be willing to give 32% of CCT shares to Plaintiffs with CES shareholders getting nothing. (*Id.*)  Defendants' offer was allegedly made on a "take it or leave it" basis. (*Id.*)

According to Plaintiffs, Mr. Jones "turned on them in the process" of shutting them out of CCT. (Compl. ¶ 54.)  Higgs Fletcher attorneys allegedly also "intentionally drafted the release [in the Vande Vegte settlement agreement] so all parties released all claims, whether known or unknown, against every other party[,]" including claims that Plaintiffs had against Mr. Failla and CCT. (*Id.* ¶ 55.)  Plaintiffs allege that "[n]one of this was explained to [them] by either the Higgs attorneys or Bob Hocker; instead, Mike Jones simply circulated the agreement for signatures." (*Id.*)  Mr. Jones has invoked this release provision in taking the position that Plaintiffs have released any claims for CCT shares. (*Id.* ¶ 56.)

In February 2015, Plaintiffs made a demand for the issuance of stocks and their officer and director positions, but Defendants refused. (Compl. ¶ 57.)

### D. Procedural History

Plaintiffs commenced this action on April 9, 2015.  Subject matter jurisdiction is based on federal question conferred as a result of asserting a claim under the Racketeering Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1962(c)-(d).  Plaintiffs' civil RICO claim is based on mail and wire fraud. (Compl. ¶¶ 65-67.)

In total, Plaintiffs assert nine claims: (1) Racketeering against all Defendants; (2) Fraud – False Promise against all Defendants; (3) Aiding and Abetting against Mr. Jones and Higgs Fletcher; (4) Fraudulent Concealment against Mr. Jones and Higgs Fletcher; (5) Breach of Oral Contract against Mr. Failla, Mr. Moberg, ChiroTouch, and CCT; (6) Conversion against Mr. Failla; (7) Breach of Fiduciary

Duty against Mr. Failla, Mr. Moberg, and ChiroTouch; (8) Breach of Fiduciary Duty against Mr. Jones and Higgs Fletcher; and (9) Failure to Issue Shares (Cal. Corp. Code §§ 2201 & 2202).

Defendants collectively move to dismiss all claims, except the Eighth claim for Breach of Fiduciary Duty against Mr. Jones and Higgs Fletcher, spanning four separate motions to dismiss, all brought under Federal Rule of Civil Procedure 12(b)(6).  Plaintiffs oppose.

## II.   LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims asserted in the complaint.  Fed. R. Civ. P. 12(b)(6); *Navarro v. Block*, 250 F.3d 729, 731 (9th Cir. 2001).  The court must accept all factual allegations pleaded in the complaint as true and must construe them and draw all reasonable inferences from them in favor of the nonmoving party.  *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996).  To avoid a Rule 12(b)(6) dismissal, a complaint need not contain detailed factual allegations, rather, it must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

//
//
//
//

"[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)) (alteration in original). A court need not accept "legal conclusions" as true. *Iqbal*, 556 U.S. at 678. Despite the deference the court must pay to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts that [he or she] has not alleged or that defendants have violated the . . . laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

Generally, courts may not consider material outside the complaint when ruling on a motion to dismiss. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). However, documents specifically identified in the complaint whose authenticity is not questioned by parties may also be considered. *Fecht v. Price Co.*, 70 F.3d 1078, 1080 n.1 (9th Cir. 1995) (superseded by statutes on other grounds). Moreover, the court may consider the full text of those documents, even when the complaint quotes only selected portions. *Id.* It may also consider material properly subject to judicial notice without converting the motion into one for summary judgment. *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994).

### III. DISCUSSION

#### A. RICO

Under RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To state a civil RICO claim, a plaintiff must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known

as "predicate acts") (5) causing injury to a plaintiff's "business or property." *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005). Furthermore, a valid conspiracy under RICO requires a "substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses." *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000) (citing 18 U.S.C. § 1962(d); *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993)).

Across their motions to dismiss, Defendants challenge the sufficiency of the same three elements for a civil RICO claim—racketeering activity, pattern, and enterprise. Plaintiffs respond that Defendants' position lacks merit and that they adequately allege facts to satisfy each element for a civil RICO claim.

### 1. Racketeering Activity

"Racketeering activity" is defined to encompass a variety of criminal acts identified in 18 U.S.C. § 1961(1). *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 557 (9th Cir. 2010). Racketeering activities actionable under RICO include mail and wire fraud. 18 U.S.C. § 1961(1)(B); *see also Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004). In the complaint, Plaintiffs allege predicate acts of wire and mail fraud based on "numerous letters delivered through the U.S. postal service, . . . numerous emails, and . . . several telephone calls to carry out their scheme to defraud." (Compl. ¶ 65.)

Wire or mail fraud consists of the following elements: (1) formation of a scheme or artifice to defraud; (2) use of the United States mails or wires, or causing such a use, in furtherance of the scheme; and (3) specific intent to deceive or defraud. *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400 (9th Cir. 1986). Like other fraud-based claims, allegations of wire and mail fraud are subject to the heightened pleading standard under Federal Rule of Civil Procedure 9(b), which requires pleading "circumstances constituting fraud or mistake" must be stated with particularity, but permits "malice, intent, knowledge, and other conditions of a

person's mind" to be alleged generally. *See* Fed. R. Civ. P. 9(b); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (knowledge can be alleged generally); *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065-66 (9th Cir. 2004) ("plaintiff must allege time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation"). Consequently, "[t]he only aspects of wire [or mail] fraud that require particularized allegations are the factual circumstances of the fraud itself." *Odom v. Microsoft Corp.*, 486 F.3d 541, 544 (9th Cir. 2007).

Plaintiffs allege that "[t]he purpose of the association-in-fact enterprise was to divest Eddie Campos, Brian Blatz and Scott Noll of their ownership rights and officer and director positions at CCT." (Compl. ¶ 60; *see also* Compl. ¶¶ 59, 61.) They direct the Court's attention to three paragraphs in the complaint—paragraphs 47, 48, and 65—explaining that these paragraphs demonstrate that "Defendants engaged in numerous acts of fraud and racketeering, all of which are plead with specificity." (Pls.' ChiroTech/Moberg Opp'n 11:17-20.) These paragraphs recount emails sent to potential investors "tout[ing] the experience and value of [Mr. Failla's] 'partners,' Campos, Blatz and Noll," and further communications with potential investors "continually referenc[ing] the amount of work Campos, Blatz and Noll were performing for CCT." (Compl. ¶¶ 47-48.) The remaining communications mentioned are: (1) the circulation of the Vande Vegte settlement agreement in May 2013 via email to "cut off any rights the Plaintiffs had to their shares and officer and director positions in CCT"; (2) a September 2013 email and letter to Plaintiffs that the they would not receive the shares and positions allegedly promised; and (3) a November 2013 email explaining that the decision to not issue shares and confer the officer and director positions was pursuant to the Vande Vegte settlement agreement. (*Id.* ¶ 65(e)-(g).) These allegations fail to satisfy Rule 9(b)'s heightened pleading standard.

//

Foremost, Plaintiffs fail to explain how Defendants', and more specifically, Mr. Failla's, representations about Plaintiffs' involvement in CCT is part of a scheme to defraud Plaintiffs of their ownership rights and officer and director positions at CCT. Rather, Plaintiffs, in conclusory fashion, state that "[t]hese letters constitute mail fraud . . . and the emails constitute wire fraud . . . because they were part of a scheme to defraud Plaintiffs, were sent with the intent to defraud Plaintiffs, it was reasonably foreseeable the mail and wire systems would be used, and the mail and wire systems were actually used." (Compl. ¶ 66.) The substance of the communications to potential investors do not involve any misrepresentations or omissions related to surreptitiously seizing or retaining Plaintiffs' ownership rights or director and officer positions in CCT. Stated differently, the chain of events connecting allegedly false representations made to potential investors to divesting Plaintiffs of the ownership rights and officer and director positions in CCT is ambiguous.

That leaves the three communications sent to Plaintiffs regarding the shares and positions in CCT. Plaintiffs fail to allege or explain how the September 2013 email and letter and the November 2013 email include any deception or fraud. To the contrary, the September 2013 email and letter transparently declares that Defendants would not issue Plaintiffs shares or confer the officer and director positions in CCT, and the November 2013 email explains why the shares and positions are being denied, pursuant to a provision in the Vande Vegte settlement agreement. Without more, these communications do not come close to satisfying Rule 8, let alone Rule 9(b).

The last communication mentioned is the May 2013 email circulating the Vande Vegte settlement agreement. Plaintiffs describe the purported racketeering related to the May 2013 email as "[a]ttempting to draft the Vande Vegte settlement agreement to release claims the Plaintiffs had against Failla and CCT, and transmitting the Settlement Agreement via email to Plaintiffs in May 2013." (Compl.

¶ 65(e).) The allegation regarding the May 2013 email can be understood in two likely ways: (1) the fraud occurred in the drafting of the settlement agreement; or (2) the fraud occurred in the transmission of the settlement agreement. If Plaintiffs meant the former, the May 2013 email suffers from the same problem as the September 2013 and November 2013 communications in that the "fraud" was or should have been transparent to Plaintiffs. This is especially so given that Mr. Blatz is a licensed attorney. It is hard to find without further explanation how such transparent conduct amounted to fraud. And the latter interpretation fails to satisfy Rule 9(b). Plaintiffs might have meant that the fraud in the transmission is the result of circulating a document produced via fraud, but Plaintiffs do not cite any legal authority to support that interpretation. Based on the facts alleged in the complaint, it is simply unclear a fraud occurred in the transmission of the settlement agreement. *See* Fed. R. Civ. P. 9(b).

In sum, Plaintiffs fail to adequately allege facts with specificity to establish predicate acts based on mail and wire fraud, particularly in demonstrating the specific intent to deceive or defraud and demonstrating the use of mails or wires in furtherance of the scheme. *See Schreiber Distrib.*, 806 F.2d at 1400. Moreover, the attenuated relationship between the communications identified and the alleged injury also fails to satisfy the proximate-cause requirement for a civil RICO claim. *See Oki Semiconductor Co. v. Wells Fargo Bank, N.A.*, 298 F.3d 768, 773 (9th Cir. 2002) (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 269 (1992)) ("Some 'direct relationship' between the injury asserted and the injurious conduct is necessary."); *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (1991) ("[T]he compensable injury flowing from a [RICO] violation . . . 'necessarily is the harm caused by predicate acts sufficiently relate[.]'").

The failure to adequately allege racketeering activity alone is enough for the Court to dismiss Plaintiffs' civil RICO claim at this point. *See Living Designs*, 431 F.3d at 361. But the Court will continue and address the pattern requirement.

### 2. Pattern

In order to establish a pattern of racketeering activity, a plaintiff must allege at least two related predicate acts occurring within a ten-year time period that "amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239-40 (1989); 18 U.S.C. § 1961(5).

The continuity requirement may be satisfied by alleging either "close-ended" or "open-ended" continuity. Close-ended continuity involves "a series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 242; *see also Religious Tech. Ctr. V. Wollersheim*, 971 F.2d 364, 366-67 (9th Cir. 1992). Open-ended continuity involves "a specific threat of repetition extending indefinitely into the future," or predicate acts that "are part of an ongoing entity's regular way of doing business." *H.J. Inc.*, 492 U.S. at 242; *Ticor Title Ins. Co. v. Florida*, 937 F.2d 447, 450 (9th Cir. 1991). "The circumstances of the case, however, must suggest that the predicate acts are indicative of a threat of continuing activity." *Medallion Television Enters., Inc. v. SelecTV of Cal., Inc.*, 833 F.2d 1360, 1363 (9th Cir. 1987). Furthermore, "predicate acts designed to bring about a single event [or injury] . . . [do] not pose a threat of continuity." *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1535-36 (9th Cir. 1992); *see also Jarvis v. Regan*, 833 F.2d 149, 152-53 (9th Cir. 1987) (pattern requirement not satisfied by allegations that legal aid organizations committed three predicate acts of mail and wire fraud in obtaining a single federal grant to defray costs of opposing a ballot initiative).

Setting aside Plaintiffs' failure to adequately allege at least two predicate acts, Plaintiffs also fail to allege facts satisfying the continuity requirement for a civil RICO claim. As discussed in greater detail above, there are no facts alleged sufficiently relating the purported predicate acts. There are merely clusters of communications, some to potential investors and others between the parties, that appear unrelated to each other and, more importantly, unrelated to the alleged purpose of the scheme. There are also no facts alleged suggesting a threat of

repetition indefinitely into the future. To the contrary, Plaintiffs' allegations demonstrate that Defendants successfully completed their goal to deny Plaintiffs their shares and positions in CCT that they are entitled to pursuant to an oral agreement. Any scheme concocted by Defendants is complete. And based on the facts alleged, there are no further shares or positions that Defendants could conceivably withhold. Simply put, the circumstances of the case do not suggest that the "predicate acts are indicative of a threat of continuing activity." *See Medallion*, 833 F.2d at 1363.

All of Plaintiffs' allegations are that Defendants engaged in mail and wire fraud to bring about a single event—denying Plaintiffs the benefit of the oral promise made in "early 2010," with no threat of continuity. *See Sever*, 978 F.2d at 1535-36; *Medallion*, 833 F.2d at 1363. This is not a civil RICO case. It is an action for breach of contract, a contract Plaintiffs entered into with little bargaining power as they faced the prospects of another failed company in CES. (*See* Compl. ¶¶ 24-25.) Because Plaintiffs fail to adequately allege a substantive civil RICO claim under § 1964(c), they also necessarily fail to allege a civil RICO conspiracy under § 1964(d). *See Howard*, 208 F.3d at 751. Accordingly, the Court **GRANTS** Defendants' motions to dismiss Plaintiffs' civil RICO claim under 18 U.S.C. § 1692(c)-(d) as to all Defendants.

### B. Remaining State-Law Claims

Plaintiffs' civil RICO claim provides the only basis for federal subject-matter jurisdiction. Although a federal court may exercise supplemental jurisdiction over state-law claims "that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution," a court may decline to exercise supplemental jurisdiction where it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(a), (c)(3); *see also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's discretion whether to exercise [supplemental]

jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."). The Supreme Court has explained that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1046 (9th Cir. 1996).

Because the Court has dismissed Plaintiffs' civil RICO claim, the Court declines to exercise supplemental jurisdiction over the remaining state-law claims. *See* 28 U.S.C. § 1367(c)(3). The remaining claims stem from violations of state statutes and common law, and thus, are properly adjudicated in state court. *See Carnegie-Mellon Univ.*, 484 U.S. at 350 n.7.

## IV. CONCLUSION & ORDER

In light of the foregoing, the Court **GRANTS WITH LEAVE TO AMEND** Defendants' motions to dismiss. Specifically, the Court **DISMISSES** Plaintiffs' civil RICO claim brought under 18 U.S.C. § 1964(c)-(d).

The scope of leave to file an amended complaint is limited to amending *only* the civil RICO claim to allege additional facts that cure the defects identified in this order. Plaintiffs may not plead additional claims, add additional parties, or add allegations that are not intended to cure the specific defects the Court has noted. Should any amended complaint exceed the scope of leave to amend granted by this order, the court will strike the offending portions under Rule 12(f). *See* Fed. R. Civ. P. 12(f) ("The court may [act on its own to] strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."); *see also Barker v. Avila*, No. 2:09-cv-00001-GEB-JFM, 2010 WL 3171067, at *1-2 (E.D. Cal. Aug. 11, 2010) (striking an amendment to federal-law claim where the court had

1  granted leave to amend only state-law claims).

2      If Plaintiffs choose to file an amended complaint, they must do so no later than

3  **<u>April 20, 2016</u>**.

4      **IT IS SO ORDERED.**

6  DATED: March 30, 2016

7  Hon. Cynthia Bashant
United States District Judge